FULTON COUNTY COMMISSIONERS
and Fulton County Highway Department, Appellants–Defendants,

v.

Ted J. MILLER and Janet L. Miller,
Appellees–Plaintiffs.

No. 50A03–0210–CV–347.

Court of Appeals of Indiana.

May 30, 2003.

Steven P. Polick, Kristin A. Mulholland, Steven P. Polick & Associates, Highland, IN, Attorneys for Appellants.

Mark A. Scott, King, McCann & Scott, Kokomo, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Ted Miller ("Miller") and Janet Miller (collectively "the Millers") filed a complaint against the Board of Commissioners of Fulton County and the Fulton County Highway Department (collectively "the County") following a collision between Miller's vehicle and a county-owned and operated street-sweeping vehicle. A jury found in favor of the Millers on their negligence claim, and the County appeals, presenting the following issues for our review:

1. Whether the trial court abused its discretion when it admitted into evidence excerpts from the Indiana Manual on Uniform Traffic Control Devices for Streets and Highways.

2. Whether the trial court abused its discretion when it permitted the Millers' expert witness to testify regarding the impact of dust on Miller's vision.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On July 13, 1998, at approximately 7:40 a.m., Miller was driving his pickup truck northbound on Old U.S. 31 approaching the County Road 500 intersection in Fulton County. At that time, County employee Steven Backus was operating a street-sweeping vehicle on Old U.S. 31 just across the County Road 500 intersection from Miller. The street-sweeping vehicle was traveling approximately five to thirteen miles per hour, and it was stirring up gravel dust in its path.[1] The speed limit on Old U.S. 31 at that location is fifty-five miles per hour, but Miller was traveling approximately forty-five miles per hour as he ascended a hill in the highway. When Miller crested the hill, he saw some dust in the air which turned into a "whiteout." Miller applied his brakes, but he was unable to avoid colliding with the rear of the street-sweeping vehicle. Miller did not see the vehicle prior to the collision.

Miller sustained several serious injuries and required emergency surgery to repair lacerations to his liver and bowel. The Millers filed a complaint against the County, alleging that the County was negligent in failing to post warning signs, traffic signals, flares, flagmen, or escort vehicles behind the street-sweeping vehicle involved in the collision. At trial, the Millers

---

1. The County had just completed a "chip and seal" project on the highway, which left large amounts of loose gravel covering the highway. Backus was cleaning up the loose gravel with the street-sweeping vehicle.

introduced into evidence excerpts from the Indiana Manual on Uniform Traffic Control Devices for Streets and Highways ("the Manual"), which sets out guidelines for the use of such traffic control devices in conjunction with street construction and maintenance. The trial court admitted the Manual into evidence over the County's objection. The Millers also offered expert witness testimony regarding the effect of dust on Miller's ability to see the street-sweeping vehicle prior to the collision. Again, the trial court permitted that testimony over the County's objection. The jury found in favor of the Millers and awarded them $150,000. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Manual

The County first contends that the trial court abused its discretion when it permitted the Millers to introduce into evidence excerpts from the Manual. Specifically, the County maintains that the Manual does not establish the applicable standard of care and that the excerpts admitted into evidence are irrelevant. A trial court has broad discretion in determining the propriety of admission of evidence. *Mullis v. Brennan*, 716 N.E.2d 58, 66 (Ind. Ct.App.1999). Reversal of the trial court's ruling is warranted only when the court has abused its discretion, and its action is clearly erroneous and against the facts and circumstances before it. *Id.* We will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

It is well settled that governmental entities have a general duty to exercise reasonable care in designing, constructing and maintaining highways for the safety of public users. *Indiana State Highway Comm'n v. Daily Exp., Inc.*, 503 N.E.2d 1237, 1239 (Ind.Ct.App.1987). But we

have also determined that no additional, specific duty arises from the Indiana Manual on Uniform Traffic Control Devices for Streets and Highways. *Id.* at 1240. Thus, the County is correct that the Manual does not establish the standard of care in this case.

But the County ignores case law providing that the Manual can be introduced as evidence of negligence going to the ultimate factual determination of liability. *See id.* And here, the trial court properly instructed the jury in relevant part as follows:

> If you find from a preponderance of the evidence that the defendants deviated from the provisions of the Indiana Manual on Uniform Traffic Control Devices for Streets and Highways on the occasion in question without good reason or justification, you may consider their failure to follow the Manual, along with all of the other evidence and the Court's instructions, in deciding whether the defendants were negligent.

Indeed, the County did not object to that instruction, and this court has held that such an instruction was proper under similar circumstances. *See id.* (explaining that jury should be instructed to treat Manual "as any other evidence of negligence going into the ultimate factual determination of liability.") Thus, contrary to the County's assertion, the trial court did not abuse its discretion when it admitted into evidence portions of the Manual.

The County next contends that the Manual excerpts were irrelevant and therefore inadmissible under Indiana Evidence Rule 402. Specifically, the County maintains that "the matters contained in [the admitted] portions of the Manual had no relationship to the facts of the case,

[and thus] only served to mislead the jury...." We cannot agree.

The Millers' Exhibit No. 9 contains excerpts from the Manual pertaining to "warning signs," as well as the "introduction [to the Manual] and general specifications." On appeal, the County asserts that the excerpts "purportedly offering guidelines for signage during the construction and maintenance of highways" were inadmissible because there "was no evidence that Fulton County was constructing or maintaining its highway at the time of the accident." And the County contends that the portions of the Manual referring to "heavy equipment" and "closed or obstructed highways" are also factually inapplicable. In support of those contentions, the County relies on the following testimony of Fulton County Highway Superintendent Scott Tilden in response to questions by the County's attorney on cross-examination:

Q Well, I think we've covered this was not [a] heavy equipment situation, right, and some of these other sections that [the Millers'] Counsel read to you verbatim really have no application to this operation, correct?

A Correct.

* * *

Q But do you believe that [the Millers' counsel] cited sections from the Manual out of context?

A Yes.

Q Like the heavy equipment section as an example?

* * *

A Oh. Yes.

The Millers respond that the excerpts were relevant because the County was engaged in the "maintenance" of a highway at the time of the collision, and the Manual sets out the guidelines the County should follow regarding the use of warning signs and other devices designed for the safety of motorists and workmen alike. In support of that contention, the Millers rely on the following portion of Tilden's testimony regarding an introductory paragraph in the Manual:

Q Going down to 6A–4, Responsibility, the first paragraph states, "The provisions for public protection established herein are for application by (1) State highway department, county, and municipal forces performing construction or maintenance operations on roads and street[s] ..." Correct?

A That's what it say[s], yes.

Q *So, again, the Manual states that it would apply to the sort of operation that was undertaken on July 13, 1998, correct?*

A It says that in the Manual.

Q *Do you disagree with that?*

A *I wouldn't. It says it right there.*

(Emphases added).

The County's assertion that the street-sweeping operation was not "maintenance" appears disingenuous. The Manual does not define "maintenance," but the plain meaning of the word is "[t]he work of keeping something in proper condition; upkeep." *See* THE AMERICAN HERITAGE DICTIONARY 1084 (3d ed. 1992). The essence of resurfacing a highway, as was done here, is "maintaining" the highway. Thus, on its face, the Manual, which sets out guidelines for the "safe and expeditious movement of traffic through construction and maintenance zones[,]" is relevant given the facts in this case.

In addition, the street-sweeping vehicle involved in the collision with Miller's truck weighed approximately 5,000 pounds. Again, the Manual does not define "heavy

equipment," and Tilden testified that he did not consider the street-sweeping vehicle to be heavy equipment. Nonetheless, in the absence of a definition in the Manual, and despite Tilden's self-serving testimony, a reasonable inference could be made that the street-sweeping vehicle constitutes heavy equipment. And Tilden testified that the street-sweeping vehicle was an obstruction in the highway. Thus, we cannot say that the excerpts of the Manual referring to heavy equipment and obstructions are irrelevant as a matter of law. The trial court did not abuse its discretion when it admitted into evidence excerpts from the Manual.

### Issue Two: Expert Testimony

 The County next contends that the trial court abused its discretion when it permitted the Millers' expert witness, Stuart Nightenhelser, to testify regarding the effect of dust on Miller's vision at the time of the collision. Indiana Evidence Rule 702 provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

"In determining reliability ... there is no specific 'test' or set of 'prongs' which must be considered in order to satisfy Indiana Evidence Rule 702(b)." *Carter v. State*, 766 N.E.2d 377, 380 (Ind.2002) (quoting *McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind.1997)). It is well established that the trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion, and will be reversed only for abuse of that discretion. *Id.* Again, an abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Martin v. State*, 779 N.E.2d 1235, 1238 (Ind.Ct.App. 2002), *trans. denied.*

Here, Nightenhelser testified as an accident reconstructionist regarding the circumstances of Miller's collision with the street-sweeping vehicle. On appeal, the County does not challenge Nightenhelser's testimony as a whole. Instead, the County's sole contention of error concerns his testimony regarding the effect of dust in the air on Miller's vision. In particular, the County maintains that the trial court should have excluded that portion of Nightenhelser's testimony because it was not sufficiently grounded in scientific principles and was unsupported by the facts of the case. The County asserts prejudice in that "the jury was likely unduly swayed by [Nightenhelser's] opinions."

Nightenhelser testified regarding his experience and training as an accident reconstructionist specializing in the area of "optics," which involves human vision, visibility, lighting, and obstructions to a motorist's sight. He stated that the Millers hired him to "provide an analysis of the pre-accident speed, location and movement of the vehicles" and "an analysis of some of the visual factors which may have contributed ... to this collision." Nightenhelser testified that he has degrees in physics and math and that he had worked on a guidance system for the Tomahawk Cruise Missile while employed at the U.S. Naval Avionics Center in Indianapolis. He explained that his work on the guidance system involved the development of an optical system similar to the human eye and testing to determine how well that system could "see" when confronted with

different environmental conditions, such as fog, smoke, and haze. Nightenhelser testified regarding the general principles of light attenuation, which involves the ability of either a person or a missile to navigate through conditions such as fog, smoke, and rain, and he explained that those principles are based on physics and math and are accepted in the scientific community.

The County's contentions on appeal pertain to the following colloquy on direct examination:

Q ... [W]ith respect to visibility factors, I'd ... like to ask you a hypothetical. I'd like for you to assume that there is witness testimony to the effect that the vehicle—a vehicle traveling up that hill coming upon the collision ... came over the crest of the hill and after cresting the hill, there was a situation where he encountered ... very low visibility. Now, under the circumstances of low visibility where you can ascertain other vehicles in front of you, do you have an opinion based upon the foundation that we talked about before as to how the human body, the human eye processes that data and how it reacts and how that may have contributed to these circumstances?

MR. POLICK: Object to the foundation, your Honor, as well as the hypothetical, as having ... insufficient facts, facts not in evidence, calling for speculation. There's nothing that ... links any—

THE COURT: Well, come on up here. Let's argue it up here.

\* \* \*

MR. POLICK: There's nothing that links any of this theoretical talk on Direct Examination about what a Cruise Missile does as to what the

conditions were on the date of this accident, so I incorporate my Motion [in Limine] and my Memo as it was earlier stated. This is the junk science that the Court is designed to prevent.

MR. SCOTT: Judge, I think I laid a more than adequate foundation with his experience on ... the (indiscernible) issues and the visibility issues. I'm asking him a hypothetical, which is proper based upon the testimony that we just heard as well as what Mr. Smith encountered. I've tried to not deviate from that at all. It's a hypothetical. I didn't ask him to assume a particular matter or events or anything else like that. What I want him to explain to the Jury is his principle by attenuation and how that can affect a perception of reaction time; and, you know, I can go back over and ask some more questions about missiles and things like that, but I think that ...

THE COURT: No, I've heard enough about missiles.

MR. SCOTT: I mean, I think we've laid more than enough foundation.

THE COURT: Okay. I'll let you ask your question.

\* \* \*

Q Okay. Talking about the principles of light attenuation as we discussed them earlier, do you have an opinion, sir, ... in light of the hypothetical that I just gave you as to how that principle of light attenuation may have impacted ... this collision?

A Yes.

Q And what is that opinion, sir?

A Um—the discussion of that comes in two (2) parts, really. Um—one of which can have to do with the amount of dust and whether there

was enough dust there to obscure vision to a street sweeper, but the more important part has to do with how an image is presented to our eye, and we're not—we're not really talkin' about something internal with the eye. We're talking about light getting to our eye just so that we can perceive. How an image is present[ed] to our eye ... because of the dust and what our perception of that dust as an approaching motorist is. Um—for the first part, because ... Mr. Miller and Mr. Smith, who was following Mr. Miller, and the police officer who came later....

MR. POLICK: Object as to any hearsay about persons who are not here to testify....

THE COURT: Let's get back on track with your question.

A From testimony we know there was dust in the air and we know ... some time elapsed ... before it cleared away and then [the witness, Mr. Smith] could actually get a look at [Miller's] pickup truck and the street sweeper sitting there in the roadway. The more important question is ... an amount of dust, whatever it is, what effect that has on our vision as a motorist and—

Q And let's—right there is what I want you to tell the Jury. What—how does ... the experience of dust when you come across it in a situation as I've described, how does that impact how we as a driver [sic] interpret this data and react?

A That we said before that—that dust or any particular matter ... in the air ... can do two (2) things to light. Number 1, absorb it, or number 2, scatter it, and the extent to which that happens that light is absorbed or scattered and therefore the image trying to get to the eye is interrupted, the extent to which that happens is dependent only on the amount of dust.... [T]he reason that's important is that we all have the experience of driving down a gravel road, and we might come around a bend or enter a new section of the roadway and discover there's a car ahead of us and we know that because there's a what you might call a rooster tail. There's a trail of dust that the car is leaving that having [sic] to drive through and get our car dirty.... When we get into the cloud of dust, we get a gauge for how far we can see into it; and we can adjust our speed accordingly and make some judgments about speed.

THE COURT: Okay. I'm going to have you stop there. Counsel, come up here.... He's not giving you the answer I was expecting to allow, and he's getting more into a dissertation of safe driving and that kind of thing. I'm expecting him to testify about[,] kind of[,] the scientific aspect of light and reflecting off the dust, not this dissertation on safety; so you need to ask another question.

MR. SCOTT: Okay.

MR. POLICK: I'm going to renew my objection, again and just show it as continuing.

THE COURT: I'll show it as continuing, but realistically this should be a short scientific answer as to the effects of sunlight on dust and be done.

Q Very briefly, scientifically, in the principles of attenuation of light, what is it that causes difficulties when a driver experiences dust as I've set forth in my hypothetical?

A As we're looking through a certain quantity of dust, I can take a specific quantity of dust and put it into the air. As we're looking through that and it attenuates our vision, attenuates the light coming to us we can't tell looking into that cloud of dust whether it's a dense quantity of dust at a specific location that we can't see through or a sparser quantity of dust spread out over a longer length of roadway that we can't see through, because such—

Q Such as that would be elongated from a traveling vehicle going down the same—

A Right, because it's the quantity of dust that does the attenuation, so that same quantity squeezed up into a local area or stretched out over a longer area of the roadway as we're coming toward it is going to look the same to us as an approaching motorist, and therein—

Q Does that affect our visual cue? Is that what you're saying?

A Exactly, in fact, ... the longer trail is in accordance with our expectations as a driver.

Q That's what you expect?

A That's what you'd expect for two reasons. Number 1, it's a highway, and we expect that other motorists on the highway are going to be going about highway speed, about our speed; but secondly ...

THE COURT: I—I—

MR. POLICK: Objection as to any foundation his expe—

THE COURT: That ... makes ... I understand. Next question.

Q Have you explained that for the Jury, sufficiently for the Jury, do you think, Mr. Nightenhelser?

A Yes.

■ Initially, we note that the County has not demonstrated that Nightenhelser's testimony is insufficiently grounded in scientific principles. Nightenhelser went to great lengths to explain his training and experience in the field of optics, which is relevant to the issue of Miller's ability to see the street-sweeping vehicle. And the County does not directly challenge the scientific bases for his opinions on appeal.

Instead, the County's argument appears to be based entirely on its assertion that Nightenhelser's testimony was insufficiently tied to the facts of this case, because he did not do any testing to determine the amount of dust present on the highway prior to the collision. Specifically, the County contends that without testing "to prove his theories and without determining the exact levels of dust and other conditions on the date of the accident, Nightenhelser's theories are based on sheer hypothetical speculation and do not comply with the requirements of [Rule 702] and supporting Indiana case law." Again, we cannot agree.

"Although it has been said that an expert witness must have observed facts sufficient to enable him to form a valid opinion, those facts may be supplied in the form of a hypothetical question which incorporates facts previously adduced at the trial." *Hughes v. State*, 508 N.E.2d 1289, 1305 (Ind.Ct.App.1987), (Ratliff, C.J., concurring) (citations omitted), *trans. denied.* The Millers presented evidence that Miller encountered a "whiteout" of dust prior to the collision. While Nightenhelser testified that he did not know the amount of dust Miller might have encountered, that lack of factual foundation does not render his opinion regarding the effect of dust on Miller's vision speculative. Nightenhelser's testimony focused on the general

principles of light attenuation as applied to a driver coming upon "a certain quantity of dust" in the roadway. And when, on two occasions, Nightenhelser began to stray from the hypothetical question posed by the Millers' counsel, the trial court stepped in to redirect the questioning. The trial court did not abuse its discretion when it permitted Nightenhelser to testify regarding the principles of light attenuation as they apply to the hypothetical question posed by the Millers' counsel.[2] *See Hughes*, 508 N.E.2d at 1305.

Finally, the County's counsel subjected Nightenhelser to extensive cross-examination, and the County presented the testimony of its own expert witness to challenge Nightenhelser's testimony. Thus, even if the admission of the testimony were error, it was harmless. *See Suell v. Dewees*, 780 N.E.2d 870, 875 (Ind.Ct.App. 2002), *trans. denied.*

Affirmed.

BROOK, C.J., and BAILEY, J., concur.

---

**2.** We note that the challenged testimony covers approximately seven pages out of 141 pages of testimony by Nightenhelser.